1   LATHAM & WATKINS LLP
        Daniel M. Wall (Bar No. 102580)
2       Timothy L. O'Mara (Bar No. 212731)
        Andrew M. Gass (Bar No. 259694)
3   505 Montgomery Street, Suite 2000
    San Francisco, California  94111-6538
4   Telephone:  415.391.0600
    Facsimile:  415.395.8095
5   Email: dan.wall@lw.com
    Email: tim.o'mara@lw.com
6   Email: andrew.gass@lw.com

7   Attorneys for Defendant
    TICKETMASTER L.L.C.
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12  | AMIR KAZEMZADEH, | CASE NO. 5:15-CV-03593-NC |
    | INDIVIDUALLY AND ON BEHALF OF | |
13  | ALL OTHERS SIMILARLY | **TICKETMASTER L.L.C.'S NOTICE OF** |
    | SITUATED, | **MOTION AND MOTION TO DISMISS THE** |
14  | | **FIRST AMENDED COMPLAINT;** |
    |                   Plaintiff, | **MEMORANDUM OF POINTS AND** |
15  | | **AUTHORITIES IN SUPPORT THEREOF** |
    |          v. | |
16  | | **Date:**        March 2, 2016 |
    | FORTY NINERS FOOTBALL COMPANY, | **Time:**        1:00 p.m. |
17  | AND TICKETMASTER L.L.C., | **Place:**       Courtroom 7, 4th Floor |
    | | **Action Filed:** August 5, 2015 |
18  | |                   Defendants. | |
    | | Assigned To: |
19  | | The Honorable Nathanael Cousins |

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

II.    RELEVANT ALLEGATIONS ............................................................ 5

       A.    The Parties .............................................................................. 5

       B.    The Allegedly Unlawful Conduct ........................................... 6

III.   DISCUSSION .................................................................................... 7

       A.    The FAC Does Not Clearly Identify What "Market" Has Allegedly
             Been Restrained ...................................................................... 8

       B.    The Law Precludes Each of the Product Markets Potentially at
             Issue ...................................................................................... 11

             1.    "Primary" and "Secondary" 49ers Tickets Do Not
                   Constitute Separate Product Markets as a Matter of Law...... 11

             2.    Single Brand Product Markets Are Not Viable as a Matter
                   of Law ........................................................................... 13

             3.    The FAC Does Not Allege Harm to Competition in the
                   Actual Market for Ticket Exchange Services ..................... 16

IV.    CONCLUSION................................................................................. 17

1

## TABLE OF AUTHORITIES

2
**Page(s)**

3
### CASES

4

*Allied Orthopedic Apps. Inc. v. Tyco Health Care Grp. LP,*
5
    592 F.3d 991 (9th Cir. 2010) ............................................................................8

6
*Apple, Inc. v. Psystar Corp.,*
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................8, 13, 15
7

8
*In re ATM Fee Antitrust Litig.,*
    768 F. Supp. 2d 984 (N.D. Cal. 2009) ...........................................................15

9
*Bell Atl. Corp. v. Twombly,*
10
    550 U.S. 544 (2007) .............................................................................8, 15, 17

11
*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
    182 F.3d 1096 (9th Cir. 1999) .........................................................................8
12

13
*Blizzard Ent. Inc. v. Ceiling Fan Software LLC,*
    941 F. Supp. 2d 1227 (C.D. Cal. 2013) ....................................5, 6, 13, 15

14
*Brown Shoe Co., Inc. v. United States,*
15
    370 U.S. 294 (1962) ....................................................................................9, 15

16
*Burns v. Cover Studios, Inc.,*
    818 F. Supp. 888 (W.D. Pa. 1993) .................................................................13

17

18
*Colonial Med. Grp. Inc. v. Catholic Healthcare W.,*
    2010 WL 2108123 (N.D. Cal. May 25, 2010), *aff'd*, 444 Fed. App'x 937 (9th
19
    Cir. 2011) ........................................................................................................16

20
*Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.,*
    960 F. Supp. 701 (S.D.N.Y. 1997) ...........................................................5, 13
21

22
*Gough v. Rossmoor Corp.,*
    585 F.2d 381 (9th Cir. 1978) ...........................................................................8

23
*Green Country Food Mkt., Inc. v. Bottling Grp., LLC,*
    371 F.3d 1275 (10th Cir. 2004) ..................................................................5, 15
24

25
*Heart Disease Research Found. v. Gen. Motors Corp.,*
    463 F.2d 98 (2d Cir. 1972) .............................................................................11

26
*Kramer v. Pollock-Krasner Found.,*
27
    890 F. Supp. 250 (S.D.N.Y. 1995) .................................................................13

28

*L & J Crew Station, LLC v. Banco Popular de P.R.*,
    278 F. Supp. 2d 547 (D. V.I. 2003) ........................................................................10

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ..................................................................................17

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................................2, 8, 9, 15

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ................................................................................16

*Redmond v. Mo. W. State Coll.*,
    1988 WL 142119 (W.D. Mo. Nov. 2, 1988)............................................................13

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club LLC*,
    2015 WL 5731736 (N.D. Ill. Sept. 30, 2015) ........................................................14

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
    802 F. Supp. 1544 (S.D. Tex. 1991) .......................................................................10

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)..................................................................................................8

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81, 111 (S.D.N.Y. 2015).................................................................13

*StubHub, Inc. v. Golden State Warriors, LLC*,
    2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) .............................................4, 12, 14

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ..........................................................................8, 13, 15

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988)..........................................................................14

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
    536 F. Supp. 2d 1191 (C.D. Cal. 2008) .........................................................3, 10, 12

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992).....................................................................................13

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
    512 F.2d 1264 (9th Cir. 1975) .................................................................................17

*U.S. v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)..................................................................................... *passim*

*Williams v. Nat'l Football League*,
    2014 WL 5514378 (W.D. Wash. Oct 31, 2014) .....................................................13

iii

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1

# OTHER AUTHORITIES

2

3

American Bar Association Antitrust Section, Antitrust Law Developments (7th
ed.) at 603-04 ...................................................................................................................14

4

David S. Evans, *The Antitrust Economics of Multi-Sided Platform Markets*, 20
Yale J. on Reg. 325 (2003) ............................................................................................16

5

6

Roberto Roson, *Two-Sided Markets: A Tentative Survey*, 4 Rev. Network Econ.
142 (2005) .......................................................................................................................16

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE, that on March 2, 2016, at 1:00 p.m., or as soon thereafter as

4

the matter may be heard, in the United States District Court, Northern District of California,

5

Courtroom 7, 4th Floor, at 280 South First Street, San Jose, California 95113, before the

6

Honorable Nathanael Cousins, Defendant Ticketmaster L.L.C. will and hereby does move the

7

Court for an order dismissing Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6) of

8

the Federal Rules of Civil Procedure.

9

This motion is based on the Notice of Motion and Motion, the accompanying

10

Memorandum of Points and Authorities, all other papers submitted in support of the Motion, the

11

record on file in this action, and such other written and oral argument as may be presented to the

12

Court.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3      This is a purported antitrust class action brought by named Plaintiff Amir Kazemzadeh

4    ("Kazemzadeh") asserting two claims under the Sherman Act against Defendants Forty Niners

5    Football Company ("the 49ers") and Ticketmaster L.L.C. ("Ticketmaster"), and one more claim

6    under California state law against the 49ers alone.  Kazemzadeh's principal allegation is that the

7    49ers, with Ticketmaster's assistance, have "hindered" season ticket holders' ability to resell

8    their tickets by instituting policies that make it less attractive to resell tickets through any

9    platform other than the official, league-branded website, the NFL Ticket Exchange.  First

10   Amended Complaint ("FAC") ¶¶ 2-3, 7-8, 17, 31-36, 41-43, 75.  There are a number of reasons

11   why Kazemzadeh's claims can never succeed, not the least of which is that the key factual

12   allegation that Defendants have "foreclose[d] other venues for resale of 49ers tickets" is

13   demonstrably false.  *Id.* ¶ 8.  Indeed, the FAC itself admits that despite the various alleged

14   restrictions on resale, "Plaintiff was ultimately able to sell certain of his tickets through

15   stubhub.com"—i.e., a competing website.  *Id.* ¶ 44.  Regardless, for the purpose of this Motion

16   to Dismiss, even taking all the allegations as true, the FAC's failure to meet threshold pleading

17   requirements on market definition are the beginning and end of the story.

18     Ticketmaster operates the NFL Ticket Exchange website on behalf of the NFL.  The NFL

19   has established the NFL Ticket Exchange as the official forum for NFL fans to resell tickets to

20   NFL games.  *Id.* ¶ 19.  Other online ticketing websites, such as the one operated by StubHub,

21   also provide platforms for fans to resell tickets to NFL games.  *Id.* ¶¶ 9, 25.  These other

22   websites, however, do not have a formal affiliation with the NFL.  Kazemzadeh claims that the

23   49ers have introduced certain restrictions on season ticket holders' ability to print and/or

24   electronically transfer tickets until 72 hours before a game, which allegedly creates obstacles to

25   reselling 49ers tickets through any means other than using the official NFL Ticket Exchange.  *Id.*

26   ¶¶ 2-3, 7-8, 17, 31-36, 41-43, 75.  These alleged restrictions on what Kazemzadeh calls

27   "advance" ticket sales—the principal "wrong" at issue in this action—is limited to just 49ers

28

1

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   tickets.  *Id.* ¶ 66(b).  The FAC does not target, discuss, or even reference any similar policy

2   embraced by any other NFL team (with or without Ticketmaster's assent), let alone other sports

3   leagues or other entertainers.

4       Antitrust law concerns itself with competition within *markets*.  "In order to state a valid

5   claim under the Sherman Act, a plaintiff must allege that the defendant has market power within

6   a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that

7   the defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Office Solution*, 513

8   F.3d 1038, 1044 (9th Cir. 2008).  Here, the FAC contains inconsistent, ambiguous allegations on

9   the threshold question of what product "market" is supposedly harmed by the alleged limitation

10  on the resale of 49ers tickets.

11      At the outset, the FAC alleges that there are "two markets" for 49ers *tickets*—a "primary

12  market," consisting of the original sale from the 49ers to season ticket holders, and a "secondary,

13  resale market," consisting of tickets that are subsequently resold by season ticket holders to other

14  fans.  FAC ¶ 1.  The FAC then states that "[t]his complaint addresses Defendants'

15  anticompetitive and unlawful conduct to control and capitalize on the secondary, resale market

16  for 49ers *tickets* . . . ."  *Id.* (emphasis added).  The FAC, however, proceeds to identify the

17  relevant market as a "Resale Market," which it specifically defines as the combination of four

18  *distribution* channels: (a) face-to-face transactions, (b) print publications, (c) "an online

19  marketplace, such as craigslist.com," and (d) "online ticketing websites, such as

20  ticketmaster.com, stubhub.com, vividseats.com, or ticketcity.com."  *Id.* at ¶ 25.  Having done so,

21  the FAC then frames the purported harm to competition around "online ticketing websites,"

22  which provide ticket distribution *services*:

23      ▪ "Sales on *online ticketing websites*, other than the Ticket Exchange, are hindered," *id.*

24          ¶ 34 (emphasis added);

25      ▪ "[T]here are four critical differences between transactions made on the Ticket

26          Exchange and any *other ticketing resale website*," *id.* ¶ 40 (emphasis added);

27      ▪ Season ticket holders are "assessed steep transaction fees for using the Ticket

28

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

Exchange," whereas "*other ticketing websites* charge much lower fees," *id.* ¶ 48 (emphasis added);

- "The Creation of A Preferred Resale Venue . . . has restrained horizontal competition between and among *online ticket sellers*," *id.* ¶ 50 (emphasis added);

- The alleged wrongful conduct "has adversely affected and substantially lessened competition in the relevant market.  The number of 49ers tickets listed on *websites other than the Ticket Exchange* has declined . . .," *id.* ¶ 51 (emphasis added); and

- "Competition *by and among ticket websites* would produce consumer benefits."  *Id.* ¶ 52 (emphasis added).

Under the most generous interpretation, certain allegations pertain to the 49ers tickets themselves, while others unequivocally pertain to competition among online ticket distribution services.

Where, as here, it is unclear what product market is allegedly injured, an antitrust complaint must be dismissed.  *Ticketmaster L.L.C. v. RMG Technologies, Inc.*, 536 F. Supp. 2d 1191, 1195-96 (C.D. Cal. 2008).  *RMG Technologies* is directly on point.  There, the court observed that "[t]he allegations of the [complaint] are hopelessly muddled as to what product market (or markets) are at issue here.  Certain allegations pertain to 'ticket distribution services,' while others pertain to tickets themselves, and both distribution services and tickets are further sometimes divided into sales in the 'primary' and 'secondary' markets."  *Id*.  The court held that under those circumstances, "[w]hether any of these product markets might ultimately turn out to be valid or not, it is . . . impossible to tell . . . which one(s) [plaintiff] may be trying to base its case on."  *Id*. at 1196.  The same reasoning applies with equal force here.  The market allegations—which are a virtual carbon copy of those addressed by the court in *RMG Technologies*—are fatally ambiguous, requiring dismissal.  *Id*.

That said, ambiguity is only the tip of the iceberg.

*First*, Kazemzadeh's lead allegation that there is a primary and a secondary market for 49ers tickets is unequivocally fatal.  This *exact* issue was recently addressed by Northern District

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1  Judge Maxine Chesney in a case involving Golden State Warriors tickets.  *See StubHub, Inc. v.*

2  *Golden State Warriors, LLC*, 2015 WL 6755594, at *3-4 (N.D. Cal. Nov. 5, 2015).  There, as

3  here, the plaintiff's "Sherman Act claims are based on a theory that there exist two separate

4  product markets for . . . tickets . . ., the difference between those markets being whether the

5  purchaser obtains from the supplier a 'primary' ticket [directly from the Warriors] or a

6  'secondary' ticket [from another fan]."  *Id*. at *3.  After carefully considering those allegations,

7  the Court held that the "proposed product markets are not cognizable as a matter of law, as

8  neither encompass[es] all interchangeable substitute products even when all factual inferences

9  are granted in [plaintiff's] favor."  *Id.* (internal quotation marks omitted).  The Court correctly

10  recognized that "a 'primary' ticket to a Warriors game and a 'secondary' ticket to a Warriors

11  game are 'commodities reasonably interchangeable by consumers for the same purposes,' as

12  both primary and secondary tickets are used for the purpose of obtaining entry to a Warriors

13  game."  *Id.* (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

14  Consequently, the Court dismissed the complaint.  There can be no serious debate about this:  the

15  same analysis applies here, and it requires the same outcome—dismissal.

16      *Second*, the FAC only targets *one team's* ticketing policies—one team among the

17  thousands of artists, leagues, and teams whose tickets get resold on online ticketing websites

18  such as StubHub.   Consequently, the FAC is inevitably headed toward the contention that the

19  relevant market is some market *limited to 49ers tickets alone*, be it the tickets themselves, some

20  subset of those tickets, or the distribution platforms / services involved in reselling those tickets.

21  Any such argument would fail as a matter of law.  For generations, antitrust plaintiffs have

22  attempted to gerrymander "markets" to cover just a single seller's product, in order to turn the

23  seller into a "monopolist" subject to regulation under the Sherman Act.  And for generations,

24  courts have rebuffed those efforts.  *See, e.g., E.I. du Pont de Nemours & Co.*, 351 U.S. at 393

25  ("[O]ne can theorize that we have monopolistic competition in every nonstandardized

26  commodity with each manufacturer having power over the price and production of his own

27  product.  However, this power that, let us say, automobile or soft-drink makers have over their

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    trademarked products is not the power that makes an illegal monopoly."); *Green Country Food*

2    *Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("Even where brand

3    loyalty is intense, courts reject the argument that a single branded product constitutes a relevant

4    market."); *Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705

5    (S.D.N.Y. 1997) ("[T]he law is clear that the *distribution* of a single brand . . . does not

6    constitute a legally cognizable market.") (emphasis added).

7        So if in fact Kazemzadeh intends to prosecute antitrust claims alleging harm to some

8    supposed "secondary, resale market . . . [for] tickets to individual <u>49ers</u> games, " FAC ¶ 1,

9    "competition among market venues for the resale of <u>49ers</u> game tickets," *id.* ¶ 74 (emphasis

10   added), "competition between and among online ticket sellers with respect to the listing for sale

11   and selling of <u>49ers</u> game tickets," *id.* ¶ 50 (emphasis added), or anything similarly limited to

12   just one seller's product, those claims are dead on arrival. *See Blizzard Ent. Inc. v. Ceiling Fan*

13   *Software LLC*, 941 F. Supp. 2d 1227, 1234 n.6 (C.D. Cal. 2013) ("A company does not violate

14   the Sherman Act by virtue of the natural monopoly it holds over its own product.") (internal

15   quotation marks omitted).

16       This Motion is not a close call.  The Court should dismiss the FAC because its market

17   definition allegations are irrefutably defective.

18   **II.    RELEVANT ALLEGATIONS**

19       **A.    The Parties**

20       Ticketmaster provides performers, sports teams, and venues with ticket services.

21   FAC ¶ 19.  One such service is an online ticket resale website that Ticketmaster operates for the

22   NFL, called the NFL Ticket Exchange.  *Id.*  Ticketmaster has a league-wide deal with the NFL

23   that makes NFL Ticket Exchange the only "official" or authorized site on which to buy and sell

24   so-called secondary tickets for NFL games that have already been obtained from the teams in the

25   first instance (i.e., ticket resales), including for 49ers games at Levi's Stadium in Santa Clara,

26   California.  *Id.* ¶ 55, Ex. E; *see also id.* ¶ 38, Ex. D.  In the broader world of online ticket

27   exchange services, Ticketmaster competes with companies like StubHub, which sometimes

28

5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    provide the "official" online ticket exchange services to sports leagues or teams,[1] but also offer

2    unofficial resale opportunities directly to fans.

3          The 49ers are one of thirty-two NFL teams.  *Id.* ¶ 18.  They offer tickets directly to fans

4    (so-called "primary" sales) both as part of season ticket packages, which cover all home games

5    in a given season, and also for individual games.  *Id.* ¶ 24.

6          Plaintiff Amir Kazemzadeh is a San Francisco 49ers season ticket holder.  *Id.* ¶ 17.

7    **B.     The Allegedly Unlawful Conduct**

8          Kazemzadeh alleges that the 49ers and Ticketmaster have conspired to force season ticket

9    holders to use the official NFL Ticket Exchange website to resell their tickets, rather than other

10   websites.  *Id.* ¶¶ 6-8, 17, 30-36, 41-43, 50-51, 75, 80.  According to Kazemzadeh, Defendants

11   have done so by delaying season ticket holders' ability to print tickets until 72 hours before the

12   game to which the tickets allow entry, and allowing tickets to be electronically transferred

13   outside of this same 72 hour window only if done through the NFL Ticket Exchange.  *Id.*  This

14   allegedly leads to "critical differences between transactions made on the Ticket Exchange and

15   any other ticketing resale website," including whether tickets "can be immediately, electronically

16   transferred," whether a seller has to "take additional steps to complete a sales transaction," and

17   whether "payments are processed contemporaneously with ticket sales."  *Id.* ¶ 40.  Kazemzadeh

18   further alleges that as a result of these "critical differences," "[e]very ticketing website other than

19   the Ticket Exchange suffers the same fate . . . a sales transaction cannot be completed until the

20   tickets are released by the 49ers to the Season Ticket Holder."  *Id.* ¶ 34.

21              The practical effect of this policy change was to foreclose other
             venues for resale of 49ers tickets in the secondary market,
22              including through face-to-face transactions, print publications, and
             online ticketing websites other than the Ticket Exchange.  Season
23              Ticket Holders were and are prevented from selling tickets through
             these avenues because buyers simply do not want to purchase
24              tickets 72 to 48 hours prior to a game.

25

26   _____

27   [1] StubHub is the official secondary ticket platform for Major League Baseball ("MLB").  *See*
     FAC ¶ 48 (citing to MLB.com's "StubHub Frequently Asked Questions" webpage, where
28   StubHub is described as the "Official Fan to Fan Ticket Marketplace of MLB.com").

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   *Id*. ¶ 8.  Kazemzadeh alleges that the purpose of these restrictions is to drive traffic to the official

2   NFL Ticket Exchange and away from sites like StubHub.  *Id*. ¶ 6.  By doing so, the theory goes,

3   Defendants are allegedly able to charge higher fees than competitor websites for the service of

4   facilitating resales.  *Id*. ¶ 48.

5          The FAC, however, also contains a number of allegations that contradict those above.

6   *First*, despite alleging that season ticket holders are "prevented" from selling their tickets on

7   websites other than the NFL Ticket Exchange, Kazemzadeh admits that he has in fact

8   successfully sold "certain" of his 49ers tickets on other ticket exchange websites.  *Id*. ¶¶ 8, 44.

9   Furthermore, the FAC provides an example, evidenced by actual screenshots, of a 49ers season

10  ticket holder selling his or her ticket to a January 3, 2016 game on StubHub, *id*. ¶¶ 35-36, Ex. B,

11  and admits that "[t]he number of 49ers tickets listed on websites other than the Ticket Exchange

12  has declined," not ceased altogether, *id*. ¶ 51.  *Second*, Kazemzadeh alleges that the NFL Ticket

13  Exchange is subject to league-wide price floors imposed by the NFL (not the 49ers) as part of

14  "*the NFL's* attempt to take over the secondary market" for NFL tickets generally.[2]  *Id*. ¶ 49; *see*

15  *also id*. ¶ 9.  The price floors apply only to tickets sold on the official NFL Ticket Exchange, and

16  do not apply to tickets sold on other websites.  According to Kazemzadeh, "[w]hat this means is

17  that Season Ticket Holders cannot sell tickets on the Ticket Exchange if prices have fallen below

18  face value."  *Id*. ¶ 49.  If the alleged NFL-imposed price floors "put[] Season Ticket Holders in

19  an impossible Catch 22," *id*. ¶ 10, resulting in those ticket holders being "simply unable to resell

20  game tickets," *id*., it makes little or no sense to allege that Defendants are financially benefiting

21  from "assess[ing] steep transaction fees for using the Ticket Exchange," *id*. ¶ 48.

22  **III.   DISCUSSION**

23         Kazemzadeh asserts two Sherman Act claims against Ticketmaster.  First, Kazemzadeh

24  asserts a Sherman Act claim for violation of Section 1 via a "horizontal" exclusive dealing

25  relationship, and second Kazemzadeh asserts a Section 2 claim for various monopolization-

26  _____

27  [2]  This purported league-wide market for NFL tickets is yet another potential product market
     identified by the FAC, adding yet another layer of ambiguity as to what the relevant product

28  market actually is.

7

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   related offenses.  Both claims must be pleaded in relation to a "relevant market."  *See Allied*

2   *Orthopedic Apps. Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010)

3   (concluding as a matter of law that a Section 1 claim for "an exclusive dealing arrangement" is

4   subject to the rule of reason); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978)

5   ("[U]nder the rule of reason market definition is required to establish a § 1 violation[.]");

6   *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) ("In order to determine whether

7   there is a dangerous probability of monopolization, courts have found it necessary to consider the

8   relevant market[.]").  Thus, for the antitrust claims at issue here, "[f]ailure to identify a relevant

9   market is a proper ground for dismiss[al]."  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th

10  Cir. 2001); *see also Newcal*, 513 F.3d  at 1044-45; *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d

11  1190, 1195-96 (N.D. Cal. 2008) (granting motion to dismiss antitrust claims due to faulty

12  product market definition).

13      The *Twombly* pleading standard determines the adequacy of the market definition

14  allegations, no less than the other elements of an antitrust cause of action.  *Psystar Corp.*, 586 F.

15  Supp. 2d. at 1198.  Under that standard, a plaintiff must allege "plausible grounds" that establish

16  a relevant market, which means "enough facts to raise a reasonable expectation that discovery

17  will reveal evidence" that the alleged market satisfies the operative legal standards.  *Bell Atl.*

18  *Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Big Bear Lodging Ass'n v. Snow Summit,*

19  *Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999) (affirming dismissal of antitrust claim based in part on

20  failure to "sufficiently identify the markets affected by Defendants' alleged antitrust violations").

21      For the reasons discussed below, the Court should dismiss the FAC because it fails to

22  allege any viable antitrust market.

23
        A.    **The FAC Does Not Clearly Identify What "Market" Has Allegedly Been**
24            **Restrained**

25      Before a court can determine the competitive effects of any particular practice, it first

26  needs to identify the boundaries of the competition allegedly restrained by defining a "relevant

27  market."  *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 324 (1962); *Newcal*, 513 F.3d at

28

8

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1044 ("The first question we must address is whether [plaintiffs'] antitrust claims allege any
legally cognizable 'relevant market.'").  One component of a relevant market is the product
market that identifies the goods or services that compete with one another.  *Newcal*, 513 F.3d at
1045 n.4.  A properly alleged product market "must encompass the product at issue as well as all
economic substitutes for the product."  *Id.* at 1045.  That means that a market has to include all
products that are "reasonably interchangeable" with each other, and none that are not.  *E.I. du
Pont de Nemours & Co.*, 351 U.S. at 395.

      Here, Kazemzadeh's claims allege no discernible relevant product market.  The FAC
offers inconsistent and often vague references to:

- a standalone "secondary, resale market for 49ers tickets," FAC ¶ 1;
- a market for "49ers tickets" of any kind (combining so-called primary and secondary tickets together), *id.* ¶¶ 50, 80;
- a "secondary market for the *advance* resale of 49ers tickets," *id.* ¶¶ 66(b), 75, 80 (defining "advance" sales as "prior to 72 hours before a game") (emphasis added); *see also id.* ¶ 44 (implicitly defining "advance" sales as "prior to or at the beginning of the NFL Season");
- a market for NFL tickets generally (not just 49ers tickets), *id.* ¶¶ 49, 53;
- a market consisting of "*venues* for the resale of 49ers game tickets," *id.* ¶ 74 (emphasis added);
- a "[r]esale [m]arket" comprised of various distribution channels, *id.* ¶ 25;
- an "online marketplace," which includes craigslist.com, but does not include online ticket websites, *id.*; and
- a market consisting of "online ticket sellers" subject to "horizontal competition" *id.* ¶ 50.

Notably, the FAC repeatedly frames the purported harm to competition around "online ticketing
websites," which in fact provide *ticket distribution services*.  *E.g.*, *id.* ¶ 50 (alleging the purported
resale restrictions "restrained horizontal competition between and among online ticket sellers

1    with respect to the listing for sale and selling of 49ers game tickets"); ¶ 51 (alleging "competition

2    in the relevant market" is measured by "[t]he number of 49ers tickets listed on websites other

3    than the Ticket Exchange"); ¶ 52 (alleging "[c]ompetition by and among ticket websites would

4    produce consumer benefits, including by stabilizing ticket price and associated fees").

5            Even if one assumed, for the sake of argument, that any one of these might be a legally

6    cognizable market, there can be no reasonable dispute that they are clearly distinct from one

7    another.  Most glaringly, any purported market for *tickets* is entirely distinct from any purported

8    market for the *distribution* of tickets.  *RMG Techs.*, 536 F. Supp. 2d at 1196 (dismissing

9    complaint in part because plaintiff "does not appear to have appreciated the implications of this

10   distinction when drafting [the complaint]; its allegations blur the line between tickets and ticket

11   distribution services").  *RMG Technologies* holds that "*as a matter of law* . . . ticket distribution

12   services and tickets do not belong in the same market."  *Id*. (emphasis added).

13           The principle that a plaintiff needs to identify with reasonable clarity what product

14   market the case is based on is hardly a novel one; courts invoke it frequently.  *See, e.g.*, *Rockbit*

15   *Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1551 (S.D. Tex. 1991) (dismissing

16   Sherman Act claims where plaintiff "provided the Court with a number of possibly relevant

17   geographic and product markets from which to choose, [but] never specifie[d] with sufficient

18   clarity the relevant markets which [the Defendant] has allegedly monopolized"); *L & J Crew*

19   *Station, LLC v. Banco Popular de P.R.*, 278 F. Supp. 2d 547, 556, 561 (D. V.I. 2003) (dismissing

20   antitrust complaint as "fatally defective in its entirety" where it was "unclear whether the

21   relevant product market [was] all banking services or just money remittance services").

22           Here "[t]he allegations of the [FAC] are hopelessly muddled as to what product market

23   (or markets) are at issue."  *RMG Techs.*, 536 F. Supp. 2d at 1195.  As was true in *RMG*

24   *Technologies*, "[w]hether any of the[] product markets [referenced] might ultimately turn out to

25   be valid or not, it is currently impossible to tell from the [FAC] which one(s) [Kazemzadeh] may

26   be trying to base [his] case on."  *Id*. at 1196.  Ticketmaster addressed this fatal shortcoming in its

27   motion to dismiss the original Complaint.  *See* Ticketmaster's Mot. to Dismiss the Compl. at 7-8,

28

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1  ECF No. 23.  Yet despite receiving an opportunity to cure the basic defects that motion

2  identified, Kazemzadeh continues to bring claims that reflect precisely the "sloppy, scatter-shot"

3  approach to antitrust pleading that courts have long rejected.  *Heart Disease Research Found. v.*

4  *Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972) ("[T]here is a limit to how much a court

5  may be called upon to divine in assessing the sufficiency of the complaint before it . . . .").  For

6  this reason alone, the Court should dismiss the FAC.

7  **B.      The Law Precludes Each of the Product Markets Potentially at Issue**

8  Even if one concluded that the present market allegations were not unclear and/or

9  inconsistent, no construction of the FAC could yield a viable product market.

10
   **1.      "Primary" and "Secondary" 49ers Tickets Do Not Constitute**
11 **Separate Product Markets as a Matter of Law**

12 One of the possible product markets that might be at issue in this case is what the FAC

13 terms the "secondary, resale market for 49ers tickets."  FAC ¶ 1.  According to the FAC, this

14 "market" consists of tickets to 49ers games sold by season ticket holders (not the 49ers) to other

15 fans.  *Id*.  This "secondary market" for 49ers tickets is supposedly distinct from what the FAC

16 refers to as the "primary market" for 49ers tickets.  *Id.* ¶¶ 1, 80.  The so-called "primary market"

17 is limited to tickets sold directly from the 49ers to fans.  *Id*.

18 The proposed "secondary market" for 49ers tickets fails as a matter of law because there

19 is not a separate product market for 49ers game tickets sold by the 49ers, and another for 49ers

20 game tickets sold by some person or entity other than the 49ers.  Whether a ticket is purchased

21 directly from an NFL team or indirectly from another fan makes absolutely no difference.  The

22 "primary" vs. "secondary" nomenclature does not change the nature of the ticket.  To the

23 contrary, a valid ticket allows one to see the exact same game either way.  It is hornbook law that

24 any viable product market must include all "commodities reasonably interchangeable by

25 consumers for the same purposes," and a ticket to a 49ers game is clearly a substitute for another

26 ticket to a 49ers game, irrespective of who the seller is.  *E.I. du Pont*, 351 U.S. at 395; *see also*

27 *RMG Techs.*, 536 F. Supp. 2d at 1197 ("Why are retail and resale tickets not acceptable

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    economic substitutes for each other?  The Court is reasonably sure that . . . [a consumer] would

2    not care whether her ticket was purchased through Ticketmaster in the 'retail' market or from a

3    ticket broker in the 'resale' market ... as long as she is able to attend the [event].").

4         This was in fact the express holding in a nearly identical case also involving resale tickets

5    to a professional sports team's home games decided by another Court in the Northern District

6    just last month.  *See StubHub, Inc. v. Golden State Warriors, LLC*, 2015 WL 6755594, at *3-4

7    (N.D. Cal. Nov. 5, 2015).  In that case, StubHub alleged Sherman Act claims against the Golden

8    State Warriors and Ticketmaster that were "based on a theory that there exist two separate

9    product markets for Warriors tickets to games played at Oracle Arena, the difference between

10   those markets being whether the purchaser obtains from the supplier a 'primary' ticket or a

11   'secondary' ticket."  2015 WL 675594 at *3.  The Court held that the proposed "primary" and

12   "secondary" markets were "not cognizable as a matter of law" since "neither encompasses all

13   interchangeable substitute products."  *Id.* (internal quotation marks omitted).  "In particular," the

14   Court held that "a primary ticket to a Warriors game and a secondary ticket to a Warriors game

15   are commodities reasonably interchangeable by consumers for the same purposes as both

16   primary and secondary tickets are used for the purpose of obtaining entry to a Warriors game."

17   *Id.* (quoting *du Pont*, 351 U.S. at 395) (internal quotation marks omitted).  The very same

18   reasoning is controlling here, with respect to 49ers tickets, and forecloses the viability of the

19   "primary" and "secondary resale" product markets alleged by the FAC.

20        While the Court's analysis can end here, the FAC actually admits the interchangeability

21   of the goods traded in each of these purportedly independent "markets."  In paragraph 24 of the

22   FAC, Kazemzadeh concedes that in addition to tickets sold directly to season ticket holders, the

23   "resale from Season Ticket Holders on the secondary market" is an "*alternative source of supply*

24   for individual tickets to 49ers games."  FAC ¶ 24 (emphasis added).  This is the very definition

25   of two goods that are, if not in fact the same product, nevertheless in the *same market*—i.e., the

26   "supply" of one serves as an "alternative source" for the supply of the other.  Kazemzadeh's

27   allegations regarding the "primary" and "secondary resale" markets are therefore "internally

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    contradictory," and implausible under *Twombly*.  *See Psystar Corp.*, 586 F. Supp. 2d at 1200.  To

2    the extent the FAC intends to allege harm to either of these markets, it fails.

3            **2.**        **Single Brand Product Markets Are Not Viable as a Matter of Law**

4            A lawsuit predicated on harm to some alleged market that is limited to 49ers-related

5    products—whether the tickets themselves or distribution services for any subset of those

6    tickets—cannot succeed as a matter of law.  "[T]he law is clear that the distribution of a single

7    brand . . . does not constitute a legally cognizable market."  *Global Disc. Travel Servs.*, 960 F.

8    Supp. at 705 (rejecting alleged product market of tickets for travel on one airline between certain

9    city pairs).  Indeed, "single-brand" product markets are almost *never* viable. "[T]o define the

10   market as that group of products over which a defendant exercises control would as an analytic

11   matter read the market definition step out of the Sherman Act."  *Spinelli v. Nat'l Football*

12   *League*, 96 F. Supp. 3d 81, 111 (S.D.N.Y. 2015) (internal quotation marks omitted).  Courts have

13   aptly described such market definitions as "tautological," *Burns v. Cover Studios, Inc.*, 818 F.

14   Supp. 888, 892 (W.D. Pa. 1993); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257

15   (S.D.N.Y. 1995), and an exercise in circular reasoning,  *Redmond v. Mo. W. State Coll.*, 1988

16   WL 142119, at *2 (W.D. Mo. Nov. 2, 1988).  *See also Tanaka*, 252 F.3d at 1065 ("By

17   attempting to restrict the relevant market to a single athletic program in Los Angeles based solely

18   on her own preferences, [plaintiff] has failed to identify a relevant market for antitrust

19   purposes."); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3d

20   Cir. 1992) ("[P]laintiffs' basic theory is that the relevant tying product market consists only of

21   new Chrysler cars manufactured for sale in the United States.  If the market were so defined, of

22   course Chrysler would have market power, being the sole seller.  But such a narrow definition

23   makes no sense in terms of real world economics, and as a matter of law we cannot adopt it.");

24   *Blizzard Ent. Inc.*, 941 F. Supp. 2d at 1234 n.6 ("[A] company does not violate the Sherman Act

25   by virtue of the natural monopoly it holds over its own product.") (internal quotation marks

26   omitted); *Williams v. Nat'l Football League*, 2014 WL 5514378, at *4 (W.D. Wash. Oct 31,

27   2014) (dismissing antitrust claims for faulty market definitions where "Plaintiff's threadbare

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   allegations do not relate to competition between firms in a market, but to the exercise of a natural

2   monopoly on sales of tickets to a single stadium"); *Theatre Party Assocs., Inc. v. Shubert Org.,*

3   *Inc.*, 695 F. Supp. 150, 155 (S.D.N.Y. 1988) (dismissing Sherman Act claim because "[a] seller

4   is free to control the distribution of its own product").[3]

5         Recently, the District Court for the Northern District of Illinois applied these long-

6   accepted principles to dismiss with prejudice a complaint contending that the Chicago Cubs

7   unlawfully restrained competition in a "Live Cubs Game Product" market and a "Live Rooftop

8   Games Product" market by erecting a scoreboard that blocked rooftop views of Wrigley Field.

9   *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club LLC*, 2015 WL 5731736 at *3 (N.D.

10  Ill. Sept. 30, 2015) (publication forthcoming).  The court held that *neither* market "is a plausible

11  relevant market . . . because each depends upon the Cubs' presentation of live professional

12  baseball, and a single brand product like producing live-action Cubs games cannot be a relevant

13  market."  *Id.*; *see also StubHub*, 2015 WL 6755594, at *4 (concluding that a proposed market

14  limited to Warriors tickets "fails for the additional reason" that it was a legally impermissible

15  single-brand product market).

16        The reason courts consistently refuse to recognize single-brand product market

17  definitions is straightforward:  if the provision of, say, 49ers tickets by the 49ers and their agent

18  (i.e. Ticketmaster) were a market unto itself, then virtually every professional sports team and

19  performing artist—not to mention every airline, rail carrier, motor coach, movie theatre,

20  museum, and other ticketed services—would equally be a "monopolist" subject to regulation

21

22  [3] As a leading treatise puts the point:

23      Relevant markets generally cannot be limited to a single

24      manufacturer's products.  As the Supreme Court recognized in
        *United States v. E.I. du Pont de Nemours & Co.,* manufacturers

25      ordinarily should not be deemed to have "monopolized" their own
        products.  The Court explained that the "power that, let us say,

26      automobile or soft-drink manufacturers have over their
        trademarked products is not the power that makes an illegal

27      monopoly.  Illegal power must be appraised in terms of the
        competitive market for the product."

28  American Bar Association Antitrust Section, Antitrust Law Developments (7th ed.) at 603-04.

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1    under the Sherman Act.  That is not how antitrust law works.  To the contrary, antitrust case law

2    ensures that "[s]ingle-brand markets are, at a minimum, extremely rare." *Psystar Corp.*, 586 F.

3    Supp. 2d at 1198; *see also In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal.

4    2009) ("[C]ourts have been extremely reluctant to embrace . . . single-brand market theory . . . .")

5    (internal quotation marks omitted).

6          Against the overwhelming weight of this precedent, Kazemzadeh offers almost nothing to

7    justify the suggestion that 49ers tickets, or online services to help people resell 49ers tickets,

8    should be deemed a market unto themselves.  Kazemzadeh alleges that "there is no substitute for

9    a ticket to a 49ers game," but offers only one reason why that might be true—allegedly because

10   49ers fans have a strong allegiance to the team.  FAC ¶ 23 (alleging that "Northern California

11   football fans align themselves with the 49ers or the [NFL's Oakland] Raiders, but not both,"

12   citing to news reports that describe a "culture war" and "full-on clash" between the two fan

13   bases).  That's not remotely enough.

14         For starters, simply saying that the operative legal test is satisfied is the very definition of

15   an allegation that does not survive a motion to dismiss under *Twombly*.  *Twombly*, 550 U.S. at

16   555 ("[O]n a motion to dismiss, courts are not bound to accept as true a legal conclusion couched

17   as a factual allegation.") (internal quotation marks omitted).  Furthermore, the case law is crystal

18   clear that "[e]ven where brand loyalty is intense, courts reject the argument that a single branded

19   product constitutes a relevant market."  *Green Country Food Mkt.*, 371 F.3d at 1282; *Blizzard*

20   *Ent.*, 941 F. Supp. 2d at 1234 n. 6 (same).  In *Tanaka*, for example, the Ninth Circuit refused to

21   accept the "conclusory assertion that the 'UCLA women's soccer program' is 'unique' and hence

22   'not interchangeable with any other program in Los Angeles,'" even though the plaintiff herself

23   alleged it was.  252 F.3d at 1063.  The legal rule that dictates these results is straightforward:

24   "The consumers do not define the boundaries of the market; the products or producers do."

25   *Newcal*, 513 F.3d at 1045 (citing *Brown Shoe*, 370 U.S.at 325); *Tanaka*, 252 F.3d at 1063

26   (holding that "strictly personal preference . . . is irrelevant to the antitrust inquiry").

27         So to survive a motion to dismiss, Kazemzadeh needs to have alleged something more

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   than just the truism that 49ers' fans prefer 49ers tickets.  The FAC must go further, alleging facts

2   that demonstrate that there are no interchangeable, substitute products for 49ers tickets.  *See*

3   *Colonial Med. Grp. Inc. v. Catholic Healthcare W.*, 2010 WL 2108123, at *3 (N.D. Cal. May 25,

4   2010), *aff'd*, 444 Fed. App'x 937 (9th Cir. 2011) (motion to dismiss granted where complaint

5   improperly "defined the market by reference to a consumer").  The allegations in the FAC do not

6   come remotely close to doing so.  To the contrary, they merely recite the personal preferences of

7   fans, and that's not enough.  The Court should dismiss the FAC for this reason as well.

8            **3.       The FAC Does Not Allege Harm to Competition in the Actual Market
                         for Ticket Exchange Services**

9

10          There is a *bona fide* product market for ticket exchange services in which Ticketmaster

11  competes, but it is not a "market" that Kazemzadeh's FAC meaningfully addresses.

12  Ticketmaster operates one of many online ticket exchange platforms where sellers and buyers

13  trade tickets for money.  *See* FAC ¶¶ 9, 19, 25.[4]  These ticket exchange platforms, which the

14  FAC calls "ticketing websites," *id.* ¶¶ 9, 25, list tickets to *all kinds of live events* (not just 49ers

15  or NFL tickets) and compete comprehensively across sports leagues, teams, venues, and

16  performing artists for buyers and sellers, including for a status like the "preferred," "official," or

17  "authorized" supplier of exchange services to a particular league, team, venue, or artist, *see id.*

18  ¶¶ 38, Ex. D, 48.  Ticketmaster won the contract to provide official secondary ticket exchange

19  services to the NFL, while StubHub's competing "ticketing website" won the contract to provide

20  the official secondary ticket exchange services to Major League Baseball.  *Id.*

21          If Kazemzadeh had wanted to bring an antitrust claim against Ticketmaster over harm to

22  *this* market, he would have had to properly allege harm to that market *as a whole*, not just the

23  services provided to *one* team in *one* league that reflect only a tiny slice of the overall

24  competition.  *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)

25  ("The relevant market for [measuring foreclosure] includes the full range of selling opportunities

26

27  [4]  In the parlance of antitrust law, this kind of exchange is analyzed as a "multi-sided platform"
     or "two-sided market."  *See generally* Roberto Roson, *Two-Sided Markets: A Tentative Survey*,
     4 Rev. Network Econ. 142 (2005); David S. Evans, *The Antitrust Economics of Multi-Sided

28  Platform Markets*, 20 Yale J. on Reg. 325 (2003).

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: 5:15-CV-03593-NC
TICKETMASTER'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT

1   reasonably open to rivals, namely, all the product and geographic sales they may readily compete

2   for, using easily convertible plants and marketing organizations."); *Twin City Sportservice, Inc.*

3   *v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1272-1273 (9th Cir. 1975) (rejecting product

4   market definition of "concession services to major league baseball" and directing the district

5   court that "the relevant franchise market cannot be limited to those [concession franchises]

6   offered for sale by major league baseball teams" because "[t]here are . . . other leisure time

7   activities that offer for sale other concession franchises for which there are bids by

8   concessionaires").  Kazemzadeh would also have to deal with the fact that antitrust *wants* service

9   providers like Ticketmaster and StubHub to compete for major opportunities like a league or

10  team contract.  This "competition for the contract is a vital form of rivalry, and often the most

11  powerful one, which the antitrust laws encourage rather than suppress." *Menasha Corp. v. News*

12  *Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004).  So it will never do for Kazemzadeh

13  to say that Ticketmaster restrains a relevant "market" because it won the NFL and 49ers

14  contracts and enjoys some "preferred" position over rivals with respect to that very small slice of

15  the overall secondary ticket exchange space.

16  **IV.    CONCLUSION**

17      For the reasons stated, the FAC is legally defective and does not justify the tremendous

18  expense of antitrust discovery.  *See*, *e.g.*, *Twombly*, 550 U.S. at 558.  Consequently, Ticketmaster

19  respectfully asks the Court to dismiss the FAC.

20

21  Dated: December 23, 2015

22                          LATHAM & WATKINS LLP

23

24                          By ___/s/ Daniel M. Wall_____
                               Daniel M. Wall
25                             Attorneys for Defendant Ticketmaster L.L.C.

26

27

28

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO